**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLENBROOK CAPITAL LIMITED PARTNERSHIP, a limited liability partnership,<br><br>        Plaintiff,<br><br>  v.<br><br>MALI KUO, DOUGLAS WATSON, DIGITAL VIDEO SYSTEMS, a Delaware corporation and DOES 1 THROUGH 100,<br><br>        Defendants.<br>                               / | No. C07-02377 JSW<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |

Before the Court is Defendants Mali Kuo ("Kuo"), Douglas Watson ("Watson"), and Digital Video Systems, Inc.'s ("DVS") (collectively, "Defendants") third motion to dismiss. Plaintiff Glenbrook Capital Limited Partnership ("Plaintiff" or "Glenbrook") opposes the motion. For the following reasons, the Court GRANTS Defendants' motion to dismiss.

**FACTUAL BACKGROUND**

The current shareholder action arises from Defendants' alleged act of selling substantially all of DVS's assets – consisting of DVS's entire stake in another company – without holding the necessary shareholder vote, and without sufficiently disclosing their intent to use the sale proceeds to satisfy the Chief Executive Officer's personal debts. The material allegations of the Second

United States District Court

For the Northern District of California

Amended Complaint ("SAC"), which are taken as true for purposes of the current motion, are as follows.

**A.      The Parties.**

Plaintiff Glenbrook is a Nevada limited partnership.  (SAC ¶ 3.)  It holds a minority interest in Defendant DVS.  (*Id*.)

DVS is a Delaware corporation with its principal place of business in Mountain View, California.  (*Id*. ¶ 4.)  DVS became a public company on May 14, 1996, in an initial public offering registered with the SEC.  (*Id.* ¶ 10.)  DVS's shares were originally listed on the NASDAQ, but its shares now trade over-the-counter.  (*Id*.)  At the time of filing the second amended complaint, DVS's shares traded at $0.05 per share.  (*Id*. ¶ 48.)[1]

Defendant Kuo is the current Chairman and Chief Executive Officer ("CEO") of DVS.  (*Id.* ¶ 5.)  She has signed several of DVS's SEC filings, including the November 21, 2005 Form 10-Q, the December 12, 2005 Form 8-K, the December 30, 2005 Form 8-K, the March 24, 2006 Form 8-K, and the April 18, 2006 Form 8-K.  (*Id*.)  Kuo is a resident of Santa Clara County.  (*Id*.)

Defendant Watson is the Chief Operating Officer of DVS and a director.  (*Id.* ¶ 6.)  Watson had previously served as DVS's Chief Financial Officer, before resigning on March 19, 2006.  (*Id.* ¶ 45.)  He maintains control over DVS's bank accounts.  (*Id* ¶ 6.)  Watson is also a resident of Santa Clara County.  (*Id*.)

**B.      Kuo's Litigation Against DVS and Control of the Board.**

In June 2002, DVS sued Kuo and other former officers and directors in Santa Clara County Superior Court for breach of fiduciary duty.[2]  (*Id.* ¶ 14.)  Kuo filed a cross-claim for unpaid compensation and for securities fraud.  (*Id*.)  On February 1, 2005, a jury found for Kuo, and on April 8, 2005, the court entered judgment against DVS for $3.42 million.  (*Id*.)

---

[1] After 2002, DVS's only significant activity was to act as a holding company for a majority ownership position in DVS Korea, Ltd. ("DVSK").  (SAC ¶ 11.)  That interest was sold on December 29, 2005, in the transaction that is at the heart of this litigation.  (*Id*. ¶ 39.)  DVS has not filed a financial report with the SEC since November 21, 2005, but every indication is that DVS is currently a mere "shell corporation" with no or negligible continuing operations.  (*Id*. ¶¶ 12-13.)

[2] Although Kuo is currently the CEO and Chairman, she was a former employee at the time of the lawsuit.  (SAC ¶ 14.)

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    On April 29, 2005, following the entry of judgment, DVS and Kuo settled.  (*Id.* ¶ 15.)

2    Plaintiff alleges that DVS consented to the settlement under duress, when Kuo accompanied her

3    demands with threats immediately to levy upon her judgment and destroy DVS's business.  (*Id.* ¶

4    15.)  DVS and Kuo memorialized their settlement in a written agreement entitled "3.42 Million

5    Judgment Equity Conversion Agreement" ("Settlement Agreement.").  (*Id.* ¶ 16.)  The Settlement

6    Agreement required DVS to grant 1,001,740 shares of its non-restricted common stock and a

7    warrant to acquire 100,147 shares of its non-restricted common stock to Kuo and her designees.

8    (*Id.*)   The Settlement Agreement further provided that DVS was to take steps to register those shares

9    of common stock and that in the meantime it was to issue preferred stock (the "Series D") to Kuo

10   and her designees.  (*Id.*)  The Series D bore an 8% dividend, and each share of Series D was

11   convertible into ten shares of DVS common stock.  (*Id.*)  All of the purported recipients of the shares

12   of Series D were Kuo's personal creditors, business partners, relatives or nominees.  (*Id.* ¶¶ 17-19.)

13   In all, some 18 of Kuo's creditor-designees received the 100,147 shares of Series D.  (*Id.*)

14   In addition to the Series D issuance, the settlement dated April 29, 2005 also obligated

15   DVS's directors to elect a slate of Kuo's nominees to the DVS board.  (*Id.* ¶ 23.)  On May 24, 2005,

16   the DVS Board elected Kuo and two of her nominees to the Board.  (*Id* ¶ 25.)  Kuo thereby gained

17   effective control of DVS, and was appointed CEO and Chair.  (*Id.*)  Since that election, all directors

18   other than Kuo and Watson have resigned.  (*Id.*)

19   Following the settlement, on May 18, 2005, DVS, Watson, and Kuo entered into a pledge

20   agreement (the "Pledge Agreement"), which was required by the Settlement Agreement.  (*Id.* ¶ 20.)

21   The Pledge Agreement provided in part that all shares of DVSK would be pledged to Kuo upon

22   signing of the Settlement Agreement as collateral for the registration of the common stock provided

23   for in the Settlement Agreement.  (*Id.*)  Under the terms of the Pledge Agreement, Kuo and her

24   purported creditors were to receive DVS shares, to be registered almost immediately.  (*Id.*)  If they

25   did not receive the shares, Kuo and the creditors would have the right to foreclose on DVS's shares

26   in DVSK.  (*Id.*)  The Pledge Agreement was concealed by Defendants until March 2007, when it

27   was produced by Kuo in litigation between Kuo and a third party.  (*Id.* ¶ 22.)

28

**C.      Kuo Engineers the Sale of DVS's Shares in DVSK.**

Defendants intended to satisfy the terms of the Settlement Agreement, and thus Kuo's creditors, by registering the Series D shares, or the common stock into which it was convertible, so that Kuo's creditors could sell their shares on the public markets.  (*Id.* ¶ 27.)  DVS, however, was not able to register the stock because they did not timely file the required financial information with the SEC.  (*Id.* ¶¶ 28-29.)  DVS was due to file its Form 10-Q for the first quarter of 2005 on May 17, 2005.  (*Id.* ¶ 28.)  Instead, however, DVS filed a "Notification of Late Filing," which bought it an additional six days.  (*Id.*)  At or about this time, DVS's outside auditors resigned.  (*Id.*)  On May 22, 2005, DVS filed its Form 10-Q without the auditors' consent.  (*Id.*)  Absent current financial information, DVS could not register any new shares, either the Series D or new common shares.  (*Id.* ¶ 29.)

Accordingly, Defendants had to find another way to satisfy Kuo's creditors, as required under the Settlement Agreement.  (*Id.* ¶¶ 23, 29.)  On or about December 10, 2005, DVS entered into a two-page stock purchase agreement (the "SPA") with Korea Technology Investment Corp. ("KTIC") under which DVS would sell its entire stake in DVSK – substantially all of its assets – for $12 million.  (*Id.* ¶¶ 1, 31, 32.)  DVS did not retain an investment banker in connection with the sale, or make any public announcements of it prior to signing the SPA.  (*Id.* ¶ 31.)  On December 29, 2005, the sale of the DVSK stock to KTIC closed.  (*Id.* ¶ 34.)  The transaction moved so quickly that Kuo's personal attorney has called it a "fire sale."  (*Id.* ¶ 31.)

Defendants did not disclose the planned sale of DVSK stock in any public filing prior to the date the SPA was signed.  (*Id.*)  Even though it was a sale of substantially all of DVS's assets, no shareholder vote was held.  (*Id.* ¶ 37.)  Plaintiff contends that it can confirm that DVS never sought ratification of the agreement by its shareholders because Plaintiff has never been asked to ratify the sale.  (*Id.* ¶ 34, 37.)  In addition, draft minutes from the DVS Audit Committee Meeting on December 15, 2005 disclose that one of the directors stated the proper procedures were not followed in agreeing to the SPA.  (*Id.* ¶ 35.)  The same minutes indicate that member of the Audit Committee only found out about the sale by accident and other members indicated that Kuo had given them very different reasons for the sale, including that the proceeds would be used to hire an attorney, to buy

4

1  D&O insurance, or for unspecified "business" needs in India, and contrary to what Kuo had told the

2  Audit Committee, she had already taken $100,000 in proceeds to pay to her creditors.  (*Id.* ¶ 36.)

3  The Form 8-K dated December 12, 2005 omitted the fact that the proceeds went to Kuo's personal

4  creditors and family members and instead indicated that the completion of the transaction would

5  enable DVS to pursue other strategic alliances.  (*Id.* ¶ 38.)  The sale of DVSK closed on December

6  29, 2005, without an Information Statement filed with the SEC.  (*Id.* ¶ 39.)

7         The SPA was first disclosed in a Form 8-K dated December 12, 2005, two days after the SPA

8  was signed.  (*Id.* ¶¶ 31, 32.)  On December 30, 2005, DVS filed another Form 8-K, which stated that

9  the sale closed on December 29, 2005.  (*Id.* ¶ 40.)  Neither of the Forms 8-K disclosed, however,

10 that $1.5 million of the proceeds of the sale would be used to pay Kuo's personal creditors.  (*Id.* ¶¶

11 33, 36, 55-59.)  The Form 8-K dated December 12, 2005 states that DVS obtained written consent

12 for the transaction from the holders of a majority of its shares, but ratification was never obtained

13 from Plaintiff who was never asked to ratify the sale.  (*Id.* ¶ 37.)  It also promised that DVS would

14 seek shareholder ratification of the sale and the transaction would enable DVS to pursue other

15 strategic interests.  (*Id.* ¶ 38.)

16        The sale generated $12 million in proceeds for DVS.  (*Id.* ¶¶ 32, 33.)  On December 30,

17 2005, DVS issued checks totaling $150,000 to Kuo's personal creditors.  (*Id.* ¶ 41.)  On January 2,

18 2006, DVS issued another round of checks, totaling $788,000.  (*Id.*)  In the end, some $1.5 million

19 was paid to Kuo's creditors by DVS.  (*Id.*)  The remaining proceeds are no longer with DVS.  (*Id.* ¶

20 43.)  According to Kuo's testimony in another action quoted verbatim as an allegation in the second

21 amended complaint, the remaining proceeds were allegedly invested in an undisclosed company in

22 China.  (*Id.* ¶ 43.)

23 **D.     DVS Fails to File Required Reports with the SEC.**

24        As a publicly-traded company, DVS is required to file annual and quarterly reports with

25 the SEC on Forms 10-K and 10-Q.  *See generally* 15 U.S.C. § 78m.  DVS's last such filing was its

26 Form 10-Q filed for the third quarter of 2005.  (SAC ¶ 44.)  Since that date, DVS has not filed either

27 a Form 10-K or a Form 10-Q.  (*Id.*)  On April 17, 2006, DVS filed a Form 8-K with the SEC stating

28 that it would be unable to file its annual report for the year 2005, claiming an inability to obtain all

United States District Court

For the Northern District of California

1   necessary financial data from DVSK.  (*Id*.)

2         Plaintiff alleges that the materially misleading statements and omissions in the December 12

3   and December 30, 2005 Forms 8-K created the false impression that DVS had secured shareholder

4   approval of the sale of DVSK and would use the proceeds for "strategic alliances" when in fact Kuo

5   was already directing that checks be sent to her creditors and the remaining proceeds would go to

6   another, foreign company.  (*Id*. at ¶ 46.)  Upon announcement of the sale, DVS's stock price initially

7   increased but has continued to decline since that time.  (*Id*.)  Plaintiff alleges that the steady decline

8   in the price of DVS stock "is directly tied to the matters omitted from and/or misrepresented in the

9   December 12 and December 30, 2005 Forms 8-K.  (*Id*. ¶ 48.)  Plaintiff claims that "DVS is an empty

10  shell, having sold its only substantial asset and seen the proceeds removed from the company.  To

11  the investing public, DVS now sits idle."  (*Id*.)

12        DVS has also failed to file any proxy materials, and has not held an annual meeting of

13  stockholders since November 18, 2004.  (*Id*. ¶ 49.)  On August 8, 2007, DVS filed a Form 8-K with

14  the SEC stating that DVS's Board had approved the calling of an annual meeting of stockholders to

15  be held on October 15, 2007.  (*Id*. ¶ 50.)  As of the filing of the SAC, DVS had not filed an

16  Information Statement describing the actions to be taken at the meeting and had said nothing more to

17  its stockholders regarding the meeting.  (*Id*. ¶¶ 51, 52.)  As a result of these failures to file, DVS's

18  shareholders have no idea what happened to the remainder of the $12 million.

19  **E.   DVS Stock Price Decline.**

20        Plaintiff alleges that DVS's common stock has declined steeply since December 29, 2005,

21  when the DVSK sale closed.  (*Id*. at ¶ 46.)  By the end of March 2006, DVS's shares were trading at

22  $1.05 per share and by the end of April 2006, the stock was at $0.86 per share.  (*Id*.)  By June 15,

23  2006, the shares were trading at $0.55 per share and on May 2, 2007, the day after Plaintiff filed this

24  suit, the stock closed at $0.19.  Two days later, on May 4, 2007, DVS stock closed at $0.14 per

25  share.  (*Id*. at ¶ 47.)  As of August 27, 2008, the stock was trading at under five cents per share.  (*Id*.

26  ¶ 48.)

27                       **PROCEDURAL BACKGROUND**

28        Plaintiff originally filed this action on May 2, 2007 asserting claims for: (1) securities fraud

1  in violation of Section 10(b) and Rule 10b-5 against all Defendants; (2) failure to follow proxy

2  disclosure rules in violation of Section 14(c) of the 1934 Act and SEC Rule 14c-2 against all

3  Defendants; (3) breach of fiduciary duties in violation of the duty of loyalty against all Defendants;

4  (4) appointment of a receiver pursuant to 8 Delaware Code § 226(a)(3) against DVS; (5)

5  appointment of a receiver pursuant to 8 Delaware Code § 291 against DVS; (6) appointment of

6  receiver or custodian pursuant to Delaware common law against DVS; and (7) compelling annual

7  shareholder meeting against DVS.  Defendants previously brought a motion to dismiss, seeking an

8  order dismissing each of Plaintiff's claims.  On September 6, 2007, the Court granted Defendants'

9  motion in part, and dismissed Plaintiff's first, second and third claims without prejudice.

10       Plaintiff filed the first amended complaint ("FAC") on October 9, 2007, asserting all of the

11  same claims, save for the third claim.  Instead of claiming a breach of fiduciary duties, Plaintiff

12  claimed a violation of Section 20(a) of the 1934 Act (control person liability).  Again, Defendants

13  brought a motion to dismiss each of Plaintiff's claims.  On April 3, 2008, the Court granted

14  Defendants' motion in part and dismissed Plaintiff's first, second and third claims without prejudice.

15       Plaintiff filed the second amended complaint ("SAC") on May 19, 2008, asserting all of the

16  same claims with further factual allegations.  Again, Defendants seek an order dismissing each of

17  Plaintiff's claims.

18                                    **LEGAL STANDARD**

19  **A.    Legal Standard on Motion to Dismiss.**

20       A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal

21  sufficiency of a claim.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Because the focus of a

22  Rule 12(b)(6) motion is on the legal sufficiency, rather than the substantive merits of a claim, the

23  Court ordinarily limits its review to the face of the complaint.  *See Van Buskirk v. Cable News*

24  *Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  In considering a Rule 12(b)(6) motion, the Court

25  accepts the plaintiff's material allegations in the complaint as true and construes them in the light

26  most favorable to the plaintiff.  *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

27  Generally, dismissal is proper only when the plaintiff has failed to assert a cognizable legal theory or

28  failed to allege sufficient facts under a cognizable legal theory.  *See SmileCare Dental Group v.*

*Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 782 (9th Cir. 1996); *Balisteri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984). In pleading sufficient facts, however, a plaintiff must suggest his or her right to relief is more than merely conceivable, but plausible on its face. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).

Rule 8(a) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Accordingly, motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are typically disfavored; complaints are construed liberally to set forth some basis for relief, as long as they provide basic notice to the defendants of the charges against them. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 1248, 1257 (N.D. Cal. 2000). Where a plaintiff alleges fraud, however, Rule 9(b) requires the plaintiff to state with particularity the circumstances constituting fraud. To meet the heightened pleading requirements of Rule 9(b), the Ninth Circuit has held that a fraud claim must contain the following elements: (1) the time, place, and content of the alleged misrepresentations; and (2) an explanation as to why the statement or omission complained of was false or misleading. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–49 (9th Cir. 1994).

In the securities context, the pleading requirements are even more stringent.

**B.     Private Securities Litigation Reform Act.**

In 1995, Congress enacted the PSLRA to provide "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (Nov. 28, 1995). The PSLRA strengthened the already-heightened pleading requirements of Rule 9(b). Under the PSLRA, actions based on allegations of material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1).

The PSLRA also heightened the pleading threshold for causes of action brought under Section 10(b) and Rule 10b-5. Specifically, the PSLRA imposed strict requirements for pleading

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  scienter.  Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong

2  inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  To

3  qualify as "strong," an inference of scienter must be more than merely plausible or reasonable – it

4  must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

5  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509-10 (2007).  The Ninth Circuit, in

6  interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA]

7  must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately

8  reckless or conscious misconduct."  *In re Silicon Graphics Inc.*, 183 F.3d 970, 974 (9th Cir. 1999).

9  If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion by the

10  defendant, the court must dismiss the complaint.  *See* 15 U.S.C. §78u-4(b)(1).

11  The PSLRA's Safe Harbor provision provides that a securities fraud claim may not lie with

12  respect to a statement that is "identified as a forward-looking statement, and is accompanied by

13  meaningful cautionary statements identifying important factors that could cause actual results to

14  differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A)(I).

15  However, a person may be held liable if the forward-looking statement is made with "actual

16  knowledge ... that the statement was false or misleading."  15 U.S.C. §  78u-5(c)(1)(B); *No. 84*

17  *Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d

18  920, 936 (9th Cir. 2003); *but see In re Seebeyond Technologies Corp. Sec. Litig.*, 266 F. Supp. 2d

19  1150, 1164-65 (C.D. Cal. 2003) (disagreeing with the analysis in *America West* and finding that a

20  defendant is immune from liability if it satisfies either 15 U.S.C. § 78u- 5(c)(1)(A) or (B)).

21  **ANALYSIS**

22  **A.    Section 10(b) of the Securities and Exchange Act and Rule 10b-5.**

23  Plaintiff's first claim is for securities fraud in violation of Section 10(b) and Rule 10b-5.

24  Plaintiff alleges that Defendants sold substantially all of the assets of DVS through the sale of

25  DVSK, without disclosing their intent to use the proceeds to pay off Kuo's personal creditors.  (SAC

26  ¶ 55.)  Specifically, Plaintiff alleges that two of DVS's Forms 8-K, filed on December 12 and

27  December 30, 2005, failed to disclose that the proceeds of the sale would be used to pay Kuo's

28  personal creditors, with the remainder of the proceeds to be removed from DVS and invested in

another company in a foreign country.  (*Id.*)  Based on the fact that Plaintiff was not asked for its

approval, the refusal of Defendants' counsel to provide the identities of approving shareholders, the

minutes of the December 15, 2005 Audit Committee meeting and the speed of the execution of the

sale without the filing of an Information Statement, Plaintiff alleges that DVS had not obtained

approval for the transaction from a majority of shareholders.  (*Id.* ¶¶ 56-57.)

Section 10(b) of the Exchange Act  provides, in part, that it is unlawful "to use or employ in

connection with the purchase or sale of any security registered on a national securities exchange or

any security not so registered, any manipulative or deceptive device or contrivance in contravention

of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5,

promulgated under Section 10(b), makes it unlawful for any person to use interstate commerce:  (a)

to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material

fact or to omit to state a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or

course of business which operates or would operate as a fraud or deceit upon any person, in

connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5.

For a claim under Section 10(b) and Rule 10b-5 to be actionable, a plaintiff must allege:  (1)

a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the

plaintiff justifiably relied; (5) that proximately caused the alleged loss.  *See Binder v. Gillespie*, 184

F.3d 1059, 1063 (9th Cir. 1999).  A complaint must "specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the

statement or omission is made on information and belief, the complaint shall state with particularity

all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(2).  As discussed above, in order to

avoid having the action dismissed, a plaintiff must "plead with particularity both falsity and

scienter."  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  The Ninth Circuit, in *Ronconi*,

articulated the rule as follows:

> Because falsity and scienter in private securities fraud cases are generally
> strongly inferred from the same set of facts, we have incorporated the dual
> pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single
> inquiry.  In considering whether a private securities fraud complaint can
> survive dismissal under Rule 12(b)(6), we must determine whether 'particular
> facts in the complaint, taken as a whole, raise a strong inference that

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

> defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to investors.'  Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6).

*Id.* (citations and internal quotation marks omitted).

In this motion, Defendants contend that Plaintiff fails to satisfy the heightened pleading requirements under the PSLRA.  In particular, Defendants argue that, with regard to Plaintiff's first claim for relief:  (1) Plaintiff has failed to plead with particularity facts demonstrating a strong inference of scienter as to any Defendant; (2) Plaintiff has failed adequately to plead fraud with particularity; (3) Plaintiff fails adequately to plead loss causation; (4) Plaintiff fails adequately to plead justifiable reliance; and (5) Plaintiff fails adequately to plead that the omissions were material. Defendants also contend that the allegations against Defendant Douglas Watson remain inadequate to state a claim against him.  Further, Defendants also contend that Plaintiff's attempt to add allegations in the second amended complaint in order to redress the deficiencies in the first amended complaint is "illogical, obviously false, internally inconsistent, or in conflict with admissions made in its previous pleadings, and utterly fails to cure the deficiencies of its prior pleadings."  (Br. at 3.)

### 1.    Alleged Omissions from the Forms 8-K.

Defendants contend that Plaintiff has failed to plead the required particularized facts to support the allegations of falsity.  These allegations include that the Form 8-K dated December 12, 2005 falsely stated that:  (1) a majority of DVS's shareholders had approved the sale transaction; (2) DVS would later seek shareholder ratification of the transaction; and (3) the completion of the transaction would enable DVS to pursue other strategic alliances.  Plaintiff further alleges that the Form 8-K dated December 30, 2005 announcing that the SPA effecting the sales of DVS's shares in DVSK had closed, but did not disclose that proceeds from the sale would be used to pay Kuo's personal creditors, and that the remaining proceeds would be "removed" from the company.

Defendants, quoting *Tellabs*, 127 S.Ct. at 2510, further contend that Plaintiff inadequately pleads scienter because the pleaded facts must give rise to a "cogent and compelling" inference of scienter, "in light of other explanations."   (Br. at 4-6.)  Defendants proffer five facts that they allege undermine the requisite scienter: (1) Kuo had a legal right to execute on the company's assets under

United States District Court

For the Northern District of California

Delaware law, including the DVSK shares; (2) Defendants had to sell the DVSK shares because other creditors-designees insisted; (3) the DVSK transaction was fully disclosed and there is no duty to disclose to shareholders the purpose of the transaction when the purpose is a corporation paying its creditors; (4) the transaction was already approved by an outstanding majority of shares thus there was no conceivable motive to conceal it; and (5) Defendants maximized the shareholder value in the shares by waiting until December to go through with the sale.  (*Id.* at 6-13.)

Plaintiff, in response, argues that each of the challenged allegations is sufficiently pleaded. Plaintiff contends that the factual allegations in the second amended complaint indicate that Defendants acted with at least deliberate recklessness in making the misleading statements and omissions, and specifically argues that: (1) not a single public announcement was made concerning the sale after the SPA had been signed, despite the fact that SEC rules required that an Information Statement be filed prior to the transaction to inform investors of the material facts concerning the transaction; (2) the content of the December 12, 2005 Form 8-K feigned a legitimate corporate purpose in that it represented that the consummation of the transaction would allow DVS to pursue "other strategic interests"; and (3) the draft minutes of the Audit Committee meeting from December 15, 2005 reveal that DVS failed to follow proper procedures in agreeing to the SPA and that one of the committee's members learned of the sale by accident.  (Opp. Br. at 5-7.)

The Court reviews the law in this area then turns to the facts of this case.

Where allegations regarding a statement or omission are made on information and belief, the complaint must state with particularity all facts on which that belief is formed.  15 U.S.C. § 78u-4(b)(1).  The Reform Act's information and belief pleading standard focuses on whether there are "adequate corroborating details" in the complaint.  *See In re Silicon Graphics*, 183 F.3d at 985. The purpose of this requirement is to prevent a plaintiff from citing vague reports and unspecified sources in the hopes that discovery will turn up something actionable.  *Id.*; *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1271 (N.D. Cal. 2000) (citing *In re Silicon Graphics*, 183 F.3d at 985).  This means that a plaintiff must provide, in great detail, all the relevant facts forming the basis of his belief.  *Id.*

In discussing the requisite scienter under the PSLRA, the Ninth Circuit has explained:

> [A] private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless[3] or conscious misconduct. ... [A]lthough facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity. Accordingly, . . . particular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the PSLRA.

*In re Silicon Graphics*, 183 F.3d at 974 (emphasis added). When considering whether a plaintiff has shown a strong inference of scienter, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs," *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002), and "answer the larger question of whether [plaintiffs'] complaint, considered in its entirety, states facts which give rise to a strong inference [of scienter]." *In re Silicon Graphics*, 183 F.3d at 985. To qualify as "strong," an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Tellabs, Inc.*, 127 S.Ct. at 2509-10.

In the instant case, Plaintiff alleges that Defendants' omissions misled the shareholders as to the purpose of the sale, eventually resulting in harm to their investments. Whether the SAC sufficiently alleges that these omissions were misleading, and whether Plaintiff has adequately pled that Defendants had the requisite scienter to so mislead, are thus the critical questions before the Court.

> **a.      The Omissions Are Alleged With Sufficient Particularity But Are Not Sufficiently Misleading.**

The Court takes each of the alleged omissions in turn to determine if the SAC sufficiently alleges that each omission "affirmatively create[d] an impression of a state of affairs that differe[d] in a material way from the one that actually existe[d,]" and, if based on information and belief, states

---

[3] The Ninth Circuit has defined recklessness in this context as: "[A] highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *S.E.C. v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003) (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc)).

13

United States District Court

For the Northern District of California

1   with particularity all facts on which the belief is formed.  *See Brody*, 280 F.3d at 1006; *In re Silicon*

2   *Graphics*, 183 F.3d at 985.

3        Plaintiff alleges four omissions or misrepresentations:  (1) not a single public announcement

4   was made concerning the sale after the SPA had been signed, despite the fact that SEC rules required

5   that an Information Statement be filed prior to the transaction to inform investors of the material

6   facts concerning the transaction; (2) the content of the December 12, 2005 Form 8-K feigned a

7   legitimate corporate purpose in that it represented that the consummation of the transaction would

8   allow DVS to pursue "other strategic interests" instead of disclosing that DVS intended to use the

9   proceeds from the sale of substantially all of the assets of DVS to pay off Kuo's personal creditors,

10  even though they had disclosed the SPA itself; (3) the draft minutes of the Audit Committee meeting

11  from December 15, 2005 indicate that DVS failed to follow proper procedures in agreeing to the

12  SPA and that one of the committee's members learned of the sale by accident; and (4) majority

13  consent needed for ratification of the transaction was not properly obtained.

14        Because these allegations are made on the basis of information and belief, Plaintiff must state

15  with particularity all facts on which the belief is formed.  Here, Plaintiff alleges facts with sufficient

16  particularity.  As the Court previously found, based on the same facts, there are adequate

17  corroborating details in the SAC supporting the allegation that Defendants entered into the SPA to

18  satisfy their judgment to Kuo and pay off her creditors.  First, Plaintiff alleges that the Santa Clara

19  County Superior Court entered judgment, in Kuo's favor, against DVS.  To satisfy this judgment,

20  and by the terms of the Settlement Agreement, Plaintiff alleges that DVS distributed Series D stock,

21  and later a portion of the assets of DVS, to Kuo's creditors.  In addition, Plaintiff alleges that

22  specific creditors of Kuo's were to receive these assets, and corroborates this allegation with a list of

23  such individuals.  Finally, Plaintiff alleges that Defendants' intention to use the proceeds of the sale

24  to pay Kuo's creditors was omitted from the December 12 and December 30, 2005 Forms 8-K.

25  Thus, Plaintiff has alleged these omissions with sufficient particularity.

26        Next, the Court must determine whether the SAC "specif[ies] the reason or reasons why the

27  statements made by [Defendants] were misleading or untrue, not simply why the statements were

28  incomplete."  *Brody*, 280 F.3d at 1006.  To be misleading, the omission must "affirmatively create

an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* Here, Plaintiff has not met this standard. To be "actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* Thus, in this Circuit,

> neither Rule 10b-5 nor Section 14(e) contains a freestanding completeness requirement; the requirement is that any public statements companies make that could affect security sales or tender offers not be misleading or untrue. Thus, in order to survive a motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), the plaintiffs' complaint must specify the reason or reasons why the statements made by [the defendant] were misleading or untrue, not simply why the statements were incomplete.

*Id.* (citations and footnotes omitted).

Here, while Plaintiff alleges that he did not know about the Pledge Agreement at the time the relevant Forms 8-K were filed, Plaintiff does not allege that Kuo's judgment against DVS, or the resulting Settlement Agreement, were unknown. Therefore, at the time the relevant Forms 8-K were filed, the known state of affairs included the outstanding judgment against DVS and in Kuo's favor. Thus, Plaintiff has not specified reasons why the alleged omissions regarding the plan for that portion of the proceeds necessary to satisfy the judgment in favor of Kuo were misleading in light of the publicly-known information regarding the judgment. In addition, Plaintiff has failed to carry its burden to demonstrate that the shareholders were misled as to the plan for that portion of the proceeds that were not designated for satisfaction of the judgment. Plaintiff alleges that Kuo testified that the remaining proceeds were invested in an undisclosed, foreign company. (SAC ¶ 43.) It appears from the testimony cited by Plaintiff in the second amended complaint and from the testimony submitted pursuant to Defendants' request for judicial notice, the remainder of the proceeds were invested overseas. This appears to be consistent with the representation that DVS intended to use the proceeds from the sale to pursue other strategic alliances.

Further, Plaintiff alleges that the draft minutes of the Audit Committee indicate that members believed "proper procedures" were not followed in the ratification of the transaction. There is no particular representation or omission that follows from the allegation that procedures were not followed. There is no "rule of completeness" in this circuit requiring disclosure of all facts related to the transaction when there has been disclosure of some pertinent facts. *See Brody*, 280 F.3d at 1006.

1    In addition, Plaintiff also now alleges that the representation that the majority of shareholders

2    ratified the transaction is demonstrably false because Plaintiff, as a shareholder, was not asked to

3    ratify the sale.  However, simply because Plaintiff, a minority shareholder, was not asked to give its

4    assent to the transaction does not in fact imply that a majority of shareholders did give their

5    approval.  *See* 8 Del. Code § 228(a) (corporate action taken by written consent of a majority of

6    shareholders in *in lieu* of voting by all shareholders and does not require that every shareholder's

7    signature be obtained or solicited).  Further, Plaintiff now contends that it has asked for information

8    about the identities of the consenting majority shareholders, without response from DVS.  The fact

9    that Defendants' counsel will not disclose the names of approving shareholders when discovery is

10   stayed as a matter of course, does not create a presumption that the majority of shareholders did not

11   give their consent to the transaction.

12   Therefore, the Court finds that the omissions and representations alleged to have been

13   misleading are not actionable in that there is no showing that they were misleading or untrue.  Even

14   if, however, the SAC contained allegations that were sufficiently misleading under *Brody*, the Court

15   must also determine whether the allegations create a sufficient inference of scienter.

16   **b.      The Allegations Do Not Create a Sufficient Inference of Scienter.**

17   The Court accepts Plaintiff's allegations as true, and analyzes them collectively, to determine

18   if a reasonable person would deem the inference of scienter at least as strong as any opposing

19   inference.  *See Tellabs, Inc.*, 127 S.Ct. at 2511.  The SAC sufficiently alleges and supports a strong

20   inference that Defendants entered into the agreement with the intention of using a portion of the

21   proceeds to pay off Kuo's creditors.  However, the SAC alleges that Defendants intentionally

22   withheld the purpose of the transaction from the shareholders with the knowledge that such

23   information would be highly material to investors, but states no further particularized facts

24   supporting a strong inference that Defendants acted with the *intent* to deceive, manipulate or

25   defraud.  Thus, to establish the requisite scienter, the SAC must support the strong inference that

26   Defendants acted deliberately reckless by making a highly unreasonable omission that is an extreme

27   departure from the standards of ordinary care.  *See Rubera*, 350 F.3d at 1094.

28   Plaintiff argues that the content of the Forms 8-K and the timeline of events are demonstrate

**United States District Court**
For the Northern District of California

1   scienter.  (Opp. Br. at 6-9.)  As to content, Plaintiff contends that the Forms 8-K omitted the real

2   plan for all of the proceeds of the sale and feigned a legitimate plan, to pursue "other strategic

3   alliances."  (*Id*.)  In addition, Plaintiff alleges that the Form 8-K dated December 12, 2005 stated

4   that the transaction was approved by a majority of the shares.[4]

5          First, Plaintiff contends that the timeline of events establishes a strong inference of scienter.

6   As alleged, DVS entered into the SPA with KTIC on December 10, 2005 and only announced that

7   agreement two days after the fact.  (SAC ¶¶ 31, 33.)  In addition, the sale closed on December 29,

8   2005 and it was not until the next day that Defendants filed the Form 8-K announcing the final sale.

9   (SAC ¶ 39.)  Defendants point out, however, that the SPA entered into on December 10, 2005 was

10  only preliminary, and, as the December 12, 2005 Form 8-K stated, either party could cancel the

11  agreement at that time.  Thus, in Defendants' view, the simple timing of the disclosure does not

12  support a strong inference of the requisite scienter.  The Court again finds that announcing a

13  preliminary sale agreement two days after it is made, but seventeen days before it is final or binding,

14  does not establish the requisite scienter.

15         On the other hand, Defendants' main contention regarding scienter is that alternate

16  inferences can be drawn from the facts alleged that foreclose the existence of a "strong inference" of

17  scienter.  As alleged, DVS was obligated to satisfy the $3.42 million judgment against DVS in Kuo's

18  favor.  Defendants intended to satisfy their obligation to Kuo by arranging a registration of stock, but

19  DVS was not able to register the stock because of a failure to file its current financial information

20  with the SEC.  Defendants then attempted to satisfy the judgment by selling the DVSK shares.

21  Thus, rather than making an extreme departure from the standard of care, Defendants could have

---

22

23         [4] In the SAC, Plaintiff also realleges that DVS represented it would seek shareholder ratification
    of the sale and the fact that no shareholder vote was taken establishes scienter and the existence of a
24  fraudulent scheme.  Plaintiff, however, does not allege that Defendants made the statement with the
    actual knowledge that statement was false or misleading.  Regardless of whether majority shareholder
25  consent was actually eventually acquired, the Court fails to see how Defendants' statement that they
    would seek shareholder ratification shows deliberate recklessness at the time the statement was made,
    especially in light of the alleged approval of the sale by a majority of the shares.  *See In re Silicon*
26  *Graphics*, 183 F.3d at 988 (holding that the heightened standard set by the PSLRA was intended to put
    an end to securities fraud lawsuits that plead "fraud by hindsight"); *see also In re GlenFed,* 42 F.3d at
27  1548-49 & n.8 (holding that "often there is no reason to assume that what is true at the moment plaintiff
    discovers it was also true at the moment of the alleged misrepresentation, and there therefore simply
28  because the alleged misrepresentation conflicts with the current state of facts, the charged statements
    must have been false").

**United States District Court**
For the Northern District of California

1  been simply fulfilling their obligations under the judgment, the Settlement and the Pledge

2  Agreement.  While Plaintiff alleges that there was misconduct at the time that DVS entered into the

3  Settlement and Pledge Agreements, Plaintiff's allegations regarding potential misconduct in the

4  Settlement Agreement is not pleaded with particularity, as is required.[5]  In addition, as before, it is

5  not self-evident how DVS's action of entering into a settlement under duress converts Defendants'

6  later omission regarding the precise plan for the proceeds of the sale into deliberately reckless

7  conduct.

8         The disclosures indicated that the proceeds would be used to pursue "other strategic

9  interests" instead of disclosing that DVS intended to use the proceeds from the sale of substantially

10  all of the assets of DVS to pay off Kuo's personal creditors and somehow to waste the rest of the

11  funds.  However, as the Court has found, the company was legally obligated to pay off the judgment

12  it owed to Kuo and her creditors, and the rest of the proceeds were, according to the pleading in the

13  complaint, invested in an overseas company.  In view of all of the allegations in the SAC, the Court

14  again finds that these allegations do not rise constitute deliberately false or misleading statements or

15  present strong inferences that Defendants acted with scienter.  Defendants were under a duty to

16  satisfy the judgment against them and thus entered into the Settlement and Pledge Agreements.

17  Defendants, after receiving approval from a majority of the shares, sold their only asset to satisfy the

18  judgment, and reported the sale to the public.  The fact that the announcements did not include the

19  precise plan for the proceeds, when the judgment was a matter of public record, does not establish

20  that Defendants acted with the requisite scienter under the PSLRA.  According to the testimony

21  submitted in this matter, the remaining assets obtained by DVS in the transaction was indeed

22  invested abroad, which can be construed as in conformity with the representation that the transaction

23  was undertaken both to satisfy legal obligations as well as to pursue other strategic alliances.  Thus,

24  the Court finds that Plaintiff has not sufficiently pleaded scienter.

25

26

27         [5] As in the prior complaints, Plaintiff fails to provide any factual support for the contention that
    DVS consented to settlement of Kuo's claims under duress.  Plaintiff does not identify to whom Kuo
    made the settlement threats and promises, when Kuo made them, or what Kuo actually said or did.

28  There is no description of the actual settlement negotiations or how Kuo created the alleged duress
    under which DVS acceded to her settlement demands.

United States District Court

For the Northern District of California

1

2.      **Allegations Against Defendant Watson.**

2    Plaintiff has alleged only the third cause of action for control person liability against

3  Defendant Watson and therefore does not include him as directly liable in the first or second cause

4  of action.  Therefore, the Court does not need to address the insufficiency of the inference of scienter

5  in connection with Defendant Watson for this claim.

6

3.      **Allegations of Loss Causation.**

7    Defendants next argue that Plaintiff failed adequately to plead loss causation with respect to

8  the alleged omissions, as required by *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1633 (2005).

9  Defendants contend that Plaintiff has not adequately shown the causal connection between the

10  decrease in the DVS stock price and the alleged omissions.  (Br. at 15-18.)   The Court agrees.

11    Even under the liberal pleading guidance of Federal Rule of Civil Procedure 8, to allege loss

12  causation a plaintiff must show the actual economic loss suffered and the causal connection between

13  that loss and the misrepresentation or omission.  *See Dura Pharm., Inc*., 125 S. Ct. at 1634.  In *Dura,*

14  the Court explained that securities fraud actions were available, "not to provide investors with broad

15  insurance against market losses, but to protect them against those economic losses that

16  misrepresentations actually cause."  *Id.* at 1633.  Plaintiff must therefore provide Defendants with

17  facts demonstrating the causal connection between the alleged misrepresentations and the losses.

18  *See id.*

19    In the original complaint, Plaintiff alleged that Defendants' material omissions caused a

20  significant loss to Plaintiff and that, as a result of the sale of DVSK, DVS stock was, at the time the

21  complaint was filed, traded at 14 cents a share.  (Complaint ¶ 55.)  In its prior order dated September

22  7, 2007, the Court  found that Plaintiff did not plead facts establishing the necessary direct link

23  between particular omissions by Defendants and the decrease in the stock price.  Then, in the first

24  amended complaint, Plaintiff alleged that DVS shares had not traded over $1.00 since April 27,

25  2006, ten days after DVS announced it would not be able to file its Form 10K.  (FAC ¶¶ 43, 60.)

26  The Court previously found that Plaintiff had linked the decrease in stock prices to DVS's

27  announcement that it would not be able to file its Form 10K in April 2006 and therefore that there

28  was no connection between the alleged omissions and the loss incurred, as required under *Dura*.

United States District Court

For the Northern District of California

1  (*See* Order at 19-20.)

2      Now, in its second amended complaint, Plaintiff seeks to replace its prior allegation that the

3  stock prices were tied to the failure to file the Form 10K in April 2006, and rather now alleges that

4  the decline in stock value was directly tied to and started with the alleged omissions and

5  misrepresentations in the Forms 8-K from December 12 and December 30, 2005.  Now, Plaintiff

6  contends that the Forms 8-K concealed material facts regarding the purpose of the transaction and

7  "as investors have figured this out by DVS's failure to [file] any required reports and continued

8  idleness, they have punished DVS and its stock has dropped.  This all started with the

9  misrepresentations and omissions in the December 12 and December 30, 2005 Forms 8-K."  (Opp.

10  Br. at 10.)

11      Plaintiff alleges, and the Court takes as true, that on announcement of the sale, DVS's stock

12  price actually increased, from $0.91 on December 12, 2005, to $1.60 on December 30, 2005 on

13  increased volume.  (SAC ¶ 46.)  Plaintiff alleges, however, that since that time the price of DVS's

14  stock has declined and that by the end of March 2006, DVS's shares were trading at $1.05 per share.

15  (*Id*.)  By the end of April 2006, the stock was at $0.86 per share.  (*Id*.)  By June 15, 2006, it was

16  trading at $0.55 per share.  (*Id.*)  On May 2, 2007, the day Plaintiff filed this lawsuit, DVS stock

17  closed at $0.19 and two days later, on May 4, 2007, DVS stock closed at $0.14 per share.  (*Id.* ¶ 47.)

18  At the time of filing the SAC, DVS stock trade at less than $0.05 a share.  (*Id.* ¶ 48.)

19      It appears from the three iterations of the complaint in this case, that Plaintiff seeks to avoid

20  the holding of this Court on its ruling on the motion to dismiss the first amended complaint by

21  amending the facts alleged to give rise to the decline in the stock value.  The first amended

22  complaint clearly linked the decline in value with the announcement that DVS was unable to file its

23  Form 10-K.  (FAC ¶ 43.)  Here, in the second amended complaint, Plaintiff fails to allege how the

24  asserted cause of the decline – the alleged omissions and misrepresentations in the company's Forms

25  8-K – led to declines in value long after the alleged precipitous event.  Plaintiff is unable to identify

26  when or how such a decline in the market was the result, not of, as previously the company's failure

27  to file quarterly reports, but rather the alleged misrepresentations and omissions in the Forms 8-K.

28  While "the court assumes that the facts alleged in a complaint are true, it is not required to indulge

20

United States District Court

For the Northern District of California

1  unwarranted inferences in order to save a complaint from dismissal." *Metzler Investment GMBH v.*

2  *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064-65 (9th Cir. 2008).  Plaintiff's original explanation

3  for the decline in value, its inability to file a Form 10-K, is much more plausible explanation of the

4  precipitous decline thereafter in May through June of 2006.

5      Plaintiff has not alleged facts sufficient to show a direct connection between the alleged

6  omissions and the loss caused, as required by *Dura*.  125 S.Ct. at 1634 (explaining that Plaintiff

7  failed to allege that the share price fell significantly after the truth became known).

8      **4.      Materiality and Justifiable Reliance.**

9      Next, Defendants contend that Plaintiff failed to plead that the alleged omission was material

10  and that Plaintiff justifiably relied on it, as is required under Rule 10b-5.  (Br. at 18-19.)  In

11  response, Again, Plaintiff contends that Defendants' arguments raise fact questions that are not

12  appropriate for resolution in this Motion.  (Opp. Br. at 11-12.)

13      An omission is material if there is a substantial likelihood that the disclosure of the omitted

14  fact would have been viewed by the reasonable investor as important.  *See Basic Inc. v. Levinson*,

15  485 U.S. 224, 231 (1988); *TSC Industries, Inc. v. Nothwary, Inc.*, 426 U.S. 438, 449 (1976);

16  *Abramson v. American Pacific Corp*., 114 F.3d 898, 902 (9th Cir. 1997).  The ultimate

17  determination of materiality includes consideration of "both the magnitude of the potential loss and

18  the likelihood that it will actually take place."  *Abramson*, 114 F.3d at 902.  A presumption of

19  reliance "is generally available to plaintiffs alleging violations of section 10(b) based on omissions

20  of material fact."  *Binder v. Gillespie*, 184 F.3d 1059, 1063 (citing *Kramas v. Security Gas & Oil,*

21  *Inc.*, 672 F.2d 766, 769 (9th Cir.1982)).

22      Here, Plaintiff alleges that the misrepresentations and omissions in the company's December

23  12 and December 20, 2005 Forms 8-K were material.  (SAC ¶ 60.)  Defendants contend, however,

24  that Plaintiff does not allege why a reasonable investor would have considered DVS's act of paying

25  down part of the $3.4 million Kuo judgment by $1.5 million out of $12 million in DVSK stock sales

26  proceeds important in making an investment decision, in light of the fact that the DVSK stock had

27  been pledged to Defendant Kuo and her creditor-designees.  *See Gluck v. Agemian*, 495 F. Supp.

28  1209, 1214 (S.D.N.Y. 1980) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449

United States District Court

For the Northern District of California

1   (1976)) ("There is simply no theory under which [the disclosure to shareholders of the terms of a

2   cash sale or pledge] can be deemed material, in the sense of 'assum(ing) actual significance in the

3   deliberations of the reasonable shareholder' or 'significantly alter(ing) the "total mix" of information

4   made available.'") Additionally, the amount alleged to have been paid to Kuo was legitimately due

5   and owing, according to Plaintiff's own allegations, as a result of the judgment in her favor and there

6   is no showing why a loss was likely to occur as a result of the payment to DVS's creditors.

7          There are repeated assertions that Plaintiff reasonably relied on DVS's statements in the

8   December 12 and December 30, 2005 Forms 8-K that DVS had received majority shareholder

9   approval of the transaction and that the proceeds of the DVSK transaction would be used to pay

10  Kuo's creditors and family members and the remainder would be invested in another, foreign

11  company.  (SAC ¶¶ 61, 71.)  There is no allegation in the complaint, however, that Plaintiff actually

12  relied on the representations or that the reliance caused it to purchase or sell stock or to suffer

13  damages.  (Id. ¶ 71.)  Again, Plaintiff merely contends that it has sufficiently pled reliance and the

14  issue is not properly resolved on a motion to dismiss and argues only that would have sought to

15  enjoin the transaction.  (Id. at ¶ 72.)  It is unclear why Plaintiff could not have sought an injunction

16  under the facts as pled, but in any case. the Court need not reach the issue of reliance given

17  Plaintiff's repeated failure sufficiently to allege scienter, loss causation or that the alleged omissions

18  or misrepresentations were misleading.

19         For these reasons, the Court GRANTS Defendants' motion to dismiss Plaintiff's first claim

20  for violation of Section 10(b) and Rule 10b-5.

21  **C.     Section 14(c) – Information Statement and Violation of Proxy Disclosure Rules.**

22         Plaintiff's second claim is for violation of the proxy disclosure rules, Section 14(c) of the

23  1934 Securities Exchange Act, 15 U.S.C. § 78n(c), and SEC Rule 14c-2, 17 C.F.R. § 240.14c-

24  2(a)(1), (b).  Plaintiff claims that because Defendants planned to sell substantially all of DVS's

25  assets, they needed shareholder authorization and therefore had to circulate an information statement

26  containing the information specified in Schedule 14C at least 20 days prior to the earliest date on

27  which the action could be taken.  Plaintiff contends that Defendants' action violated Exchange Act

28  Rule 14c-2, promulgated pursuant to Section 14(c), which requires an information statement prior to

22

United States District Court

For the Northern District of California

1   corporate action "by the written authorization or consent of security holders."  17 C.F.R. § 240.14c-

2   2(a)(1).

3          Section 14(c) mandates the distribution of an "information statement" to certain shareholders

4   prior to an annual or special meeting of shareholders whenever management fails to solicit proxies

5   to the extent necessary to trigger Section 14(a).  15 U.S.C.A. § 78n(b)(2).  The information

6   statement contains the same information as a Section 14(a) proxy statement and is subject to the

7   same anti-fraud provisions as a proxy statement.  In other words, Section 14(c) requires

8   management, when no proxy vote is undertaken, nonetheless to disseminate information statements

9   to shareholders that contain substantially the same information required to be provided in a proxy

10  solicitation.  *Ciro, Inc. v. Gold*, 816 F. Supp. 253, 269 (D. Del. 1993).

11         In the previous motion to dismiss in this case, Defendants argued that Plaintiff, as a minority

12  shareholder, had no private right of action to assert this claim because no economic harm resulted

13  from Defendants' nondisclosure.  Alternatively, Defendants contended that Plaintiff had failed to

14  satisfy the pleading requirements for securities fraud under 15 U.S.C. § 78u-4(b) and Rule 9(b).

15  After analyzing the relevant case law, the Court declined to address whether a private right action

16  exists under Section 14(c), and instead found that the original complaint, read in light of the

17  Supreme Court's guidance in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991),

18  militated against the creation of an implied cause of action under Section 14(c) in cases, such as this,

19  where minority shareholders seek relief from a transaction that they apparently could not have

20  prevented.  The Court noted that in the original complaint Plaintiff alleged that the injury was not

21  caused by Defendants' failure to send out a timely notice, but rather, was caused by the mere fact

22  that Plaintiff, as a minority shareholder, was powerless to stop the DSVK stock sale.  The Court

23  further noted that to the extent that Plaintiff, or a critical mass of the other shareholders, could have

24  stopped or otherwise influenced the DSVK stock sale, such facts were not alleged in the operative

25  complaint.

26         In this third motion to dismiss, Defendants again contend that the SAC does not remedy the

27  defects the Court noted in its two previous orders.  In the SAC, Plaintiff newly alleges that as a

28  result of Defendants' failure to file an information statement, Plaintiff was harmed because it was

1    denied the opportunity to seek on its own to enjoin the sale of the DVSK stock and subsequent use

2    of the proceeds to pay Kuo's personal creditors, or to enlist other stockholders in an effort to stop the

3    transaction.  (SAC ¶ 72.)  In response, Defendants contend that Plaintiff still does not allege facts

4    showing that Plaintiff, or a mass of other unidentified shareholders, would have been able to stop or

5    influence the DVSK stock sale or any reason a court would have enjoined the transaction a majority

6    of the shareholders approved.  (Br. at 22.)  Defendants further contend that Plaintiff could not have

7    enjoined the sale because DVS was required to sell the stock to satisfy the Settlement Agreement,

8    the stock was pledged to the judgment creditors and the sale was approved by a majority of DVS's

9    shareholders.  (Reply at 11.)

10            As in its prior order, the Court finds that the Supreme Court's guidance in *Virginia*

11   *Bankshares,* 501 U.S. 1083, militates against the creation of an implied cause of action under

12   Section 14(c) in cases, such as this case, where minority shareholders seek relief from a transaction

13   that they apparently could not have prevented.  In addition, under the particular circumstances

14   presented here, to the extent Plaintiff alleges that the nondisclosure was material as they would have

15   sought to enjoin the sale of DVSK, as the Court has already found, Plaintiff was aware of the sale in

16   December 2005 and took no action to halt the transaction.  To the extent Plaintiff claims that it only

17   would have sought to enjoin the transaction had it known the intent of DVS to pay off a judgment

18   against it, according to the facts as pled, should such an injunction been issued, the creditors would

19   have been entitled to foreclose on the stock in any case.  Therefore, the alleged omission would be

20   immaterial.  *See CalPERS v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004).  Either there is no

21   implied private right of action under Section 14(c) under these circumstances, or the alleged

22   violation of the proxy rules was immaterial under the facts as pled.

23            For these reasons, the Court GRANTS Defendants' motion to dismiss Plaintiff's second

24   claim for violation of Section 14(c).

25   **D.       Section 20(a) – Control Person Liability.**

26            Plaintiff's third claim is for a violation of Section 20(a) of the 1934 Securities Exchange Act,

27   15 U.S.C. § 78t, or control person liability.  Defendants contend that liability under this section

28   depends on the existence of a primary violation of the provisions of the Exchange Act.  (Br. at 25.)

1    The Court agrees.

2        Section 20(a) of the Securities Exchange Act provides derivative liability for those who

3    control others found to be primarily liable under the Act.  *See In re Ramp Networks, Inc. Sec. Lit.*,

4    201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002); *see also Johnson v. Aljian*, 490 F.3d 778, 781 n.11

5    (9th Cir. 2007).  Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of

6    Section 10(b), the pleading requirements for both violations are the same.  *See In re Ramp Networks*,

7    201 F. Supp. 2d at 1063.  "To be liable under section 20(a), the defendants must be liable under

8    another section of the Exchange Act."  *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971,

9    978 (9th Cir.1999).

10        Here, Plaintiff has not stated a claim against Defendants under the Securities and Exchange

11   Act and thus there can be no primary liability under the act from which the control person liability

12   under Section 20(a) derives.  Plaintiff does not contend otherwise.

13        For these reasons, the Court GRANTS Defendants' motion to dismiss Plaintiff's third claim

14   for violation of Section 20(a).

15   **E.    Leave to Amend is Denied.**

16        Because there have already been three iterations of the complaint filed in this matter and the

17   Court is not satisfied that Plaintiffs would be able to plead any additional facts, the first, second and

18   third claims are dismissed with prejudice.  *See, e.g., Moore v. Kayport Package Express, Inc.*, 885

19   F.2d 531, 540-41 (9th Cir. 1989) (upholding denial of leave to file third amended complaint to allege

20   securities fraud where investors had failed to cure pleading deficiencies of earlier complaints).

21   **F.    Remaining State Law Claims**

22        Plaintiff's fourth, fifth, and sixth claims are for the appointment of a receiver pursuant to

23   Title 8 Delaware Code Sections 226(a)(3), 291, and Delaware common law, respectively.  Plaintiff's

24   seventh and final claim seeks an order compelling Defendants to hold an annual shareholder

25   meeting pursuant to 8 Delaware Code § 211(c).  Defendants contend that if the Court dismisses the

26   federal claims, the Court should decline to exercise supplemental jurisdiction over these state law

27   claims.  (Br. at 25.)  Plaintiff argues that the Court should retain jurisdiction over these claims.

28   (Opp. Br. at 16-17.)

United States District Court

For the Northern District of California

25

1    As long as the complaint sets forth a claim "arising under" federal law, the district court may

2    adjudicate state law claims that are transactionally related to the federal claim.  *See* 28 U.S.C. §

3    1367(a).  The fact that the Court rules against Plaintiff and dismisses the federal claims prior to trial

4    does not automatically oust the court of supplemental jurisdiction.  *See* Judge William W. Schwarzer

5    et al., *Federal Civil Procedure Before Trial,* § 2:145.2 (2006).  The dismissal is a factor for the

6    Court to consider in deciding whether to decline to exercise its supplemental jurisdiction.  A court

7    has discretion to retain the supplemental state law claim and grant relief thereon.  28 U.S.C. §

8    1367(c)(3); *see United Mine Workers v. Gibbs*, 383 U.S. 715, 728 (1966); *Brady v. Brown*, 51 F.3d

9    810, 816 (9th Cir. 1995).  The court may decline to exercise supplemental jurisdiction where any of

10   the following factors exist: (1) the state law claim involves a novel or complex issue of state law; (2)

11   the state law claim substantially predominates over the claim on which the court's original

12   jurisdiction is based; (3) the district court has dismissed the claims on which its original jurisdiction

13   was based; or (4) "in exceptional circumstances, there are other compelling reasons for declining

14   jurisdiction."  28 U.S.C. § 1367(c)(1)-(4).

15   Here, because the Court has, after three iterations of the complaint, denied Plaintiff leave to

16   amend its claims that arise under federal law, and because this case is its early procedural stages and

17   the Court has not addressed the merits of the state claims, the Court will decline to exercise its

18   discretion to retain supplemental jurisdiction over the remaining state law claims.  *See* 28 U.S.C. §

19   1367(c)(3).  The Court therefore DENIES Defendants' motion to dismiss on the state law claims.

**CONCLUSION**

21   For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss without leave

22   to amend.  A separate judgment shall issue and the Clerk shall close the file.

24   **IT IS SO ORDERED.**

26   Dated:  March 30, 2009

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE